IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PRIORITY PAYMENT SYSTEMS, LLC, )
CYNERGY DATA, LLC, and PRIORITY )
HOLDINGS, LLC, )
 ) Civil Action No.
 Plaintiffs, ) 1:15-CV-04140-AT
 )
vs. ) **REDACTED**
 )
SIGNAPAY, LTD., SIGNAPAY, LLC, )
ANDRES ORDOÑEZ, TOM BOHAN, )
INTREND SOFTWARE SOLUTIONS, )
GUSTAVO SIMONE, JOHN MARTILLO, )
and NMSA CONSULTING LLC )
 )
 Defendants.

## FIRST AMENDED COMPLAINT

Plaintiffs, PRIORITY PAYMENT SYSTEMS, LLC, PRIORITY HOLDINGS, LLC, and CYNERGY DATA, LLC, file this First Amended Complaint against Defendants, SIGNAPAY, LTD, SIGNAPAY, LLC, ANDRES ORDOÑEZ, TOM BOHAN, INTREND SOFTWARE SOLUTIONS, GUSTAVO SIMONE, JOHN MARTILLO, and NMSA CONSULTING LLC and would respectfully show:

## NATURE AND BASIS OF ACTION

1.      In this action, Plaintiffs, Priority Payment Systems, LLC ("PPS"), Cynergy Data, LLC ("Cynergy"), and Priority Holdings, LLC ("Priority") (collectively, "Plaintiffs"), seek compensatory and punitive damages, injunctive relief, and other relief against Defendants, SignaPay, LTD and SignaPay, LLC (collectively, "SignaPay"), Intrend Software Solutions ("Intrend"), Gustavo Simone, Andres Ordoñez, Tom Bohan, John Martillo, and NMSA Consulting LLC ("NMSA") arising from Defendants' violations of federal and state statutes and contractual and other legal obligations owed to Plaintiffs.

2.      Specifically, since at least September 2014, Defendants have systematically engaged in a concerted effort to misappropriate or, at a minimum, reverse engineer and duplicate the proprietary, trade secret system Priority uses to manage its merchants: the Virtual Merchant Application System, or "VIMAS." Since the end of 2014, at least four Priority employees, including Defendants Ordoñez, Bohan, and Simone, each of whom was instrumental in developing and managing VIMAS, have left Priority and are now employed by SignaPay.  These four former employees have, separately and/or collectively, misappropriated Priority's proprietary VIMAS system, or portions thereof, and confidential business information in an effort to develop a competing system for SignaPay.

## PARTIES

3.     Plaintiff PPS is a limited liability company organized and existing under the laws of the State of Georgia, with its corporate headquarters and principal place of business at 2001 Westside Parkway, Suite 155, Alpharetta, Georgia 30004.

4.     Plaintiff Cynergy is a limited liability company organized and existing under the laws of the State of Delaware.  Cynergy has individual members who are citizens of the states of New York and Georgia.

5.     Plaintiff Priority is a limited liability company organized and existing under the laws of the State of Delaware, with its headquarters and principal place of business at 2001 Westside Parkway, Suite 155, Alpharetta, Georgia.  Priority was formed in 2014 upon the merger of PPS and Cynergy.

6.     Defendant SignaPay is an entity organized and existing under the laws of the State of Texas, with its corporate headquarters and principal place of business at 4100 West Royal Lane, Suite 150, Irving, Texas 75063.

7.     Upon information and belief, Defendant Ordoñez is a citizen of the State of Texas.  He is currently employed by Defendant SignaPay.

8.     Defendant Bohan is a citizen of the State of Georgia and resides at 4391 E. Meadow Drive, Duluth, Georgia 30096.  He is currently employed by

Defendant SignaPay.

9.     Defendant Intrend is an entity organized under the laws of the State of Pennsylvania with its principal place of business located at 2714 Liberty Street, Easton, Pennsylvania  18045-2621.

10.     Defendant Simone is a citizen of and resides in Argentina.  He is the principal of Defendant Intrend and a former software programming contractor of Plaintiffs Cynergy and Priority.

11.     Upon information and belief, Defendant Martillo is a citizen of the State of Texas.  He is the founder and Chief Executive Officer of SignaPay.

12.     Defendant NMSA is an entity organized and existing under the laws of the State of Delaware with a principal place of business at 2616 Summit Ridge Drive, Southlake TX 76092.  Its registered agent for service of process is Andres Ordoñez.

## JURISDICTION AND VENUE

13.     This is an action for violations of (1) the Copyright Act, 17 § U.S.C. 101 *et seq.*, (2) the Computer Fraud and Abuse Act, 18 § U.S.C. 1030 *et seq.* (the "CFAA"), (3) the Stored Communications Act, 18 § U.S.C. 121 *et seq.* (the "SCA"), (4) the Racketeer Influenced and Corrupt Organizations Act, 18 § U.S.C.

1961 *et seq.* ("RICO"), (5) the Georgia Trade Secrets Act ("GTSA"), O.C.G.A. § 10-1-760 *et seq.*, and (6) duties imposed by common law.

14.     The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) and (b) and has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' claims arising under state law.

15.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial District, and pursuant to 28 U.S.C. §§ 1391(c) and 1391(d) because the activities of Defendants in this judicial District subject Defendants to personal jurisdiction here.

## FACTS GIVING RISE TO THIS ACTION

## I.     PPS, CYNERGY, PRIORITY, AND THE MERCHANT ACQUIRER BUSINESS

### A.     PPS, Cynergy, And Priority

16.     PPS was formed in 2005.  PPS is a merchant service acquirer that serves both resellers and merchants.

17.     Cynergy is a merchant service acquirer that was formed in 1998.

18.     Pursuant to an agreement announced in May 2014, PPS and Cynergy merged, thereby forming Priority.

19.     Today, Cynergy is d/b/a Priority, which means that Priority handles the marketing and management of Cynergy's products and services.

20.     Priority offers products and services that enable merchants to accept credit cards, debit cards, loyalty cards, ACH, electronic checks, and check conversion.

21.     Priority's services to resellers and merchants include credit underwriting, risk management, gateway, authorization, settlement, funding, customer services, and technical support.

**B.     The Payment Processing And Merchant Acquirer Business**

22.     Merchant service acquirers are an integral component of any card transaction.

23.     The typical payment card transaction begins when a customer provides card data to a merchant.  The merchant sends a transaction request to a payment processor (i.e., FirstData or TSYS) or a merchant service acquirer (i.e., Priority), which then sends a transaction request to a card brand (i.e., VISA, MasterCard, or American Express), which, finally, sends a transaction request to the card issuer (i.e., SunTrust or Bank of America).

24.     The card issuer will then either accept or reject the transaction and send a response to the card brand, which sends the response to the payment

processor or merchant service acquirer, which sends the response to the merchant, which then advises the customer that the transaction has been approved or rejected.

25.    As the transaction requests and the responses travel between the customer and the card issuer, each intermediary (i.e., the payment processor, merchant service acquirer, and the card brand) generally charges a transaction fee.

26.    The payment processing and merchant acquirer business is highly competitive.   To maintain market presence and to grow, merchant service acquirers, such as Priority, must acquire more merchants than they lose. Therefore, merchant acquisition and retention are vital to Priority's ongoing commercial viability.

27.    Priority primarily acquires merchants through Independent Sales Organizations ("ISOs"), which are responsible for acquiring, signing up, and managing the merchants.

28.    The ISOs use Priority's merchant management systems to sign up merchants approved for card transactions, a process that is referred to as "boarding" the merchant.

29.    ISOs also utilize Priority's merchant management systems to manage the merchant portfolios, which includes establishing merchant fees, billing merchants, calculating residual payments, and managing other merchant functions.

The merchant management systems also tie in to the software platforms of third party payment processors (i.e., FirstData and TSYS).

30.     Priority's success in the highly competitive merchant acquiring and payment processing business is due in large part to its proprietary merchant management systems, which have unique capabilities that make them attractive to ISOs.

31.     ISOs can choose between many different merchant acquirers and payment processors, but Priority's merchant management systems have features that have enabled Priority to grow rapidly by attracting new ISOs and by helping existing ISOs expand their merchant portfolio.

32.     For the year 2014, Priority ranked as the number 20 merchant acquirer in the United States.

33.     At the end of 2014, Priority managed a merchant portfolio that processed approximately $20 billion in annual dollars, representing over 230 million transactions, for more than 135,000 merchants throughout the United States.

34.     In July 2015, Priority was ranked as the fifth fastest-growing privately-held company in the metropolitan Atlanta region by the Atlanta Business Chronicle.

II.   **DEFENDANTS' MISAPPROPRIATION AND UNAUTHORIZED USE OF PRIORITY'S TRADE SECRETS**

   A.   **Priority's Proprietary VIMAS Merchant Management System And Source Code**

35.   Priority maintains two proprietary merchant management systems: MXA and VIMAS (MXA and VIMAS each hereinafter referred to as a "Merchant Management System" and, collectively, "Merchant Management Systems").

36.   The VIMAS system is comprised of four modules: (1) internal VIMAS for employees; (2) VIMAS 2.0 for external agents; (3) Cyris, which is a risk management tool used by employees and internal agents; and (4) VIMAS PRO for external merchants.

37.   VIMAS is a home-grown Merchant Management System that was developed by Cynergy's software developers over a number of years.

38.   Today, VIMAS is used by more than 70,000 merchants.

39.   One of the reasons that PPS merged with Cynergy was because the proprietary nature of VIMAS had given Cynergy a competitive advantage over rival merchant acquirers.

40.   Critical to the success of any merchant management system is an expedited boarding process.   VIMAS allows a merchant to submit an online

application that is immediately routed to underwriting, and, in most cases, quickly approved.

41.     The rapid boarding process is critical for Priority because merchants can submit an application and be ready for processing that day.  The expedited boarding process is also attractive to ISOs because it allows them to sign up merchants quickly and at minimal expense.

42.     Moreover, VIMAS has a proprietary functionality that allows ISOs to pursue high-risk merchants, merchants that have past credit issues, or are in businesses that are generally viewed as too risky to be approved for card transactions.

43.     An ISO's ability to evaluate potential risks and have high-risk merchants approved is a competitive advantage for Priority and is one of the reasons that VIMAS is attractive to ISOs.

44.     Additionally, VIMAS has features that maximize an ISO's flexibility to manage all aspects of the merchant portfolios.

45.     Furthermore, the VIMAS Source Code contains a subcomponent, which was developed by Cynergy prior to the May 2014 merger, that enables VIMAS to "talk" to TSYS via the "TSYS Express" framework.

**B.      Priority's Efforts To Protect Its Trade Secrets Such As VIMAS**

46.      Priority has implemented a number of security measures to protect its trade secrets and other sensitive data.   Priority's network infrastructure has extensive internal and external controls to prevent unauthorized access to its trade secret data such as VIMAS.

### 1.      Internal Controls And Policies

47.      Priority has numerous internal policies in place to protect its systems and data.

48.      Priority has an Employee/Contractor Security Policy ("Employee Security Policy") that addresses physical security, asset security, network security, and data security.   The Employee Security Policy prohibits any Priority employee or contractor from circumventing any of the existing security controls.

49.      The Employee Security Policy also provides that Priority will monitor and record all network usage and any suspicious activity will be investigated. Furthermore, the Employee Security Policy requires that employees and contractors only use the Priority network and data for approved, legitimate job functions.

50.      Priority's internal controls include the requirement that employees who are authorized users of Priority's network must log in using a company-

provided login ID and password.  Once logged into the network, each employee only has access to pre-approved data that is determined by that employee's job title and responsibilities.

51.    Priority also created and maintains a Data Classification Retention and Disposal Policy ("Data Security Policy"), which governs Priority's data security.

52.    Priority's Data Security Policy categorizes data on Priority's network into one of three classifications:  Critical, Sensitive, and Public.

53.    Priority's trade secrets, which include the proprietary VIMAS Source Code, are classified as Critical data.  Access to Critical data is limited strictly to employees and contractors with a "need to know" basis.

54.    Priority prohibits the transmission of Critical data to unapproved persons.  One way that Priority accomplishes this is through the use of security settings in Google:  Priority uses Google for a number of network functions, including Google Mail for e-mail, Google Drive for data sharing, and Google Hangout for video chats and screen sharing.

55.    Priority has set the security settings in Google Drive so that employees and contractors cannot send Critical data outside of the company by prohibiting the unauthorized transmission of Critical data to persons who are not

Priority's employees or contractors.  The Google User Interface allows Priority to closely monitor the data on its network and maintain data trails of who accesses and transmits Priority's data.

### 2.    Internal Training And Certifications

56.    Priority's employees also undergo substantial training regarding the importance of protecting Priority's data.

57.    Priority conducts mandatory Security Awareness Training that is intended to educate and remind all employees about the importance of protecting and securing Priority's systems and data.

58.    In addition, Priority's software programmers are required to undergo Web Application Security Risk Training annually.  This training requires all software programmers to certify that they:  (1) have attended training; (2) recognize the importance of maintaining the integrity of the systems; and (3) understand that they can be subject to discipline or civil or criminal penalties if they do not follow Priority's policies and procedures.

### 3.    External Controls

59.    Priority also takes external steps to protect its trade secrets, including conducting and maintaining network infrastructure that is protected from outside interference or access by sophisticated firewalls.

60.    Moreover, Priority has strict confidentiality provisions in its contracts with ISOs, which use Priority's Merchant Management Systems, that require the ISOs to protect Priority's systems and data.

61.    These contracts contain language that specifically prohibits ISOs from obtaining source code for the Merchant Management Systems and bars the ISOs from reverse engineering or using the source code to develop competing systems.

### C.    SignaPay's ISO Contract With Priority

62.    On May 1, 2013, SignaPay and Cynergy executed a contract called the Executive Partner Card Processing Agreement (the "Agreement") whereby SignaPay agreed to be an ISO for Cynergy to board and manage merchants using VIMAS.

63.    Under the Agreement, ███████████████████████████████████ ██████████████████████████████████████████████████████████████.

Pursuant to Section 2.7 of the Agreement, ███████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

64.    Under Section 3.4 of the Agreement, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

65.    Pursuant to Section 3.8 of the Agreement, ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    Under Section 3.8 of the Agreement, ████████████

████████████████████████████████████████████████████

████████████████████████████████

66.    Under Section 3.10 of the Agreement, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

67.    Under Section 3.10(B) of the Agreement, ███████████████

████████████████████████████████████████████

68.    Under Section 4.1(B) of the Agreement, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

69.    Under Section 4.2(A) of the Agreement, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

70.    In Section 4.2(B) of the Agreement, ███████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████

71.     Section  7.3  of  the  Agreement  ████████████████████

████████████████████████████████████████

█████████

72.     One defined  ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

73.     Under  Section  8.3  of  the  Agreement,  █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

74.     Under Section 8.5 of the Agreement,  █████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

75.     Under Section 8.8 of the Agreement, ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

76.     Under Section 8.9 of the Agreement, █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

77.     The Agreement was executed and signed by John Martillo, CEO of SignaPay, on May 16, 2013.

**D.      Defendants' Unauthorized Use Of Priority's Trade Secrets And Their Other Legal Violations**

**1.      Defendants SignaPay, Martillo, NMSA, Ordoñez, Bohan, Intrend, And Simone**

78.     Defendant SignaPay was founded in 2006 by Defendant Martillo. Martillo is the owner and Chief Executive Officer of SignaPay.

79.     Prior to forming SignaPay, Martillo was the president of Cynergy from June 1995 until January 2006.

80.     SignaPay is a merchant acquirer ISO that sells forms of payment processing, as well as software and hardware.

81.     In December 2014, SignaPay announced the acquisition of PayHub, a merchant services provider and payment technology company.

82.     Recently, SignaPay introduced a bilingual division called "SeñorPay," which offers all of its programs and services, and sales materials, forms, and agreements, in Spanish.

83.     At the time of PPS's merger with Cynergy in May 2014, Ordoñez was Cynergy's Chief Information Officer.   Ordoñez began his employment with Cynergy in 1998.

84.     Following PPS's merger with Cynergy in 2014, Priority retained Ordoñez as a senior manager.  Ordoñez left Priority at the end of 2014.

85.     Bohan was employed by Cynergy beginning in 2010.   After the Cynergy-PPS merger in 2014, Bohan was the Product Manager for Priority. Bohan left his Priority employment in early 2015.

86.     Intrend is a computer programming company.  Intrend was formed in 2009.

87.     In 2009, Intrend, through Simone, began performing software developer contractor services for Cynergy.   Ordoñez was Cynergy's Chief Information Officer at the time Simone began performing services for Cynergy.

88.     Intrend, through Simone, performed software developer services for Cynergy, and then Priority, from 2009 through the time of the events giving rise to this Complaint.

89.     NMSA is an LLC that was organized by Ordoñez in 2014.   At the time NMSA was formed, Ordoñez was employed by Priority.

> **2.     The Scheme To Misappropriate Priority's VIMAS Source Code And Other Confidential Business Information**

90.     By no later than September 27, 2014, SignaPay and Martillo decided to build a merchant management system called SAFYER that SignaPay intended to use to compete with Priority.

91.     SignaPay engaged Ordoñez, who at the time was employed by Priority, to help SignaPay build SAFYER.

92.     Ordoñez formed NMSA in the fall of 2014 to perform the development work on SAFYER for SignaPay.

93.     SignaPay and Martillo supported the formation of NMSA by executing a Term Note and Issuance Agreement in the fall of 2014 that memorialized the NMSA and SignaPay partnership to build SAFYER.

94.     SignaPay and Martillo engaged Ordoñez and NMSA with the expectation that Ordoñez and NMSA would use the VIMAS Source Code and Priority's confidential business information to develop SAFYER.

95.     From no later than September 2014 until December 31, 2014, the date Ordoñez's employment with Priority ended, Ordoñez was working on SAFYER while he had access to VIMAS Source Code and Priority's other confidential business information.   Ordoñez did not disclose his involvement in the development of SAFYER to anyone in management at Priority prior to December 31, 2014.

96.     Later in the fall of 2014, Ordoñez and NMSA engaged Bohan to assist with SAFYER's development while Bohan was still employed at Priority.

97.     From at least the beginning of October 2014 until the end of January 2015, when Bohan left Priority, he was working on SAFYER while he had access to VIMAS Source Code and Priority's other confidential business information.

98.     Neither Ordoñez or Bohan told Priority that they were working for SignaPay to develop the SAFYER system during the time they remained employed by Priority.

99.     Ordoñez and Bohan hid from Priority  the fact that they were working for SignaPay to develop SignaPay's competing merchant management system.

Both Ordoñez and Bohan used aliases and pseudonyms to hide the fact that they were working on developing SAFYER.

100.   Ordoñez used multiple aliases and pseudonyms to hide his identity from Priority including frequently using the name "Mayra Di Cristina," and e-mail addresses that generically referred to NMSA "Technical Support" so that Priority could not detect that Ordoñez was working for SignaPay and NMSA.

101.   Bohan also used an alias and pseudonyms to hide his identity from Priority including use of the name "Tom Richard," his first and middle names.  He asked SignaPay to set up a VIMAS login so he could access VIMAS without Priority's knowledge.

### 3.   Defendants' Unauthorized Use Of Priority's VIMAS Source Code

102.   The goal of Defendants was to build a merchant application system for SignaPay that was based on VIMAS.

103.   The stated goal of Defendants was to build a "better VIMAS" so they could compete directly against Priority using a merchant management system that was based on trade secrets that had been misappropriated from Priority.

104.   To accomplish that goal, Defendants used Priority's VIMAS Source Code and Priority's other confidential business information to develop SAFYER.

105.    Upon information and belief, when Ordoñez and/or Bohan left Priority they took a copy of the VIMAS Source Code or they had previously provided a copy of the VIMAS Source Code to NMSA, SignaPay, Simone, or an Argentina-based company called Luma Consultores to be used in the development of SAFYER.

106.    When Ordoñez and/or Bohan left Priority to work for NMSA and SignaPay, they lost their unfettered access to VIMAS.  As a result, SignaPay hired Simone and Intrend in the fall of 2014 to maintain SignaPay's access to VIMAS and Priority's computer systems.

107.    In October 2014, Ordoñez and NMSA hired Simone, Intrend and Luma Consultores to assist with the development of SAFYER.

108.    At the time that Simone, Intrend, and Luma Consultores were hired to work on SAFYER, Ordoñez knew that Simone and Intrend were working for Priority.

109.    Ordoñez, Bohan, and SignaPay knew that when they contracted for the services of Simone and Intrend that Simone and Intrend had access to Priority's proprietary VIMAS Source Code and other confidential business information of Priority.

110.   Ordoñez, Bohan, and SignaPay contracted with Simone and Intrend with the expectation that Simone and Intrend would use the VIMAS Source Code and other confidential business information to continue developing SAFYER.

111.   On November 24, 2014, after Simone had been engaged by SignaPay through NMSA, Simone placed a ZIP file titled "TSYS Express," which contained a portion of the VIMAS Source Code, on Priority's Google Drive.  Simone is listed as the owner of the file and he encrypted the file so that only he and the Luma Consultores developers that were working with him on SAFYER could access the file.

112.   The Luma Consultores developers had no legitimate business reason to access the Zip file containing the VIMAS because they have never worked for Priority.

113.   Ordoñez, Bohan, Simone, Intrend, and Luma Consultores accessed the VIMAS Source Code and Priority's other confidential business information as they worked on the development of SAFYER for SignaPay.

114.   For example, Priority's audit history for the ZIP file shows that prior to August 28, 2015, the only people that accessed the file were Simone and the Luma Consultores developers that were working with him on SAFYER.

115.   SignaPay and Ordoñez created a task list for SAFYER that included multiple instances where Ordoñez, Bohan, Simone, Intrend, and Luma Consultores took shortcuts in creating SAFYER that included using VIMAS Source Code and other Priority confidential business information.

116.   SignaPay, Ordoñez, and/or Bohan also routinely submitted tickets to Priority alleging a "bug" in VIMAS.  They knew that the ticket would be provided to Simone.  This provided Simone with a reason to access the VIMAS Source Code and other Priority confidential business information that ultimately would be provided to SignaPay.  The tickets also provided a way that SignaPay could obtain the logic behind the VIMAS Source Code, which further assisted SignaPay in the ongoing development of SAFYER.

117.   For example, in March 2015, Bohan suggested to Ordoñez by e-mail that they map SAFYER to VIMAS and that SignaPay should submit a "bug" to Priority so that SignaPay could gain confidential business information that was crucial to SAFYER's ongoing development.

118.   This pattern of submitting tickets to Priority in order to obtain information about how VIMAS operated continued up to December 2015, after this lawsuit was filed, when Ordoñez asked that a ticket be submitted so that SignaPay could obtain information about Priority's merchants.

119.   Ordoñez and Bohan also shared information concerning the design requirements of Cyris with SignaPay.  Ordoñez sought to use the rules that existed in Cyris's fraud detection system to prepare flags for SignaPay's competing system.

120.   Bohan circulated to SignaPay employees a document that explained all of the logic in the Cyris code that was put together for Cynergy's risk department.  Bohan offered to interpret the content of the documents because its contents were complex.

### 4.   Priority's Discovery Of Defendants' Scheme To Misappropriate Priority's VIMAS Source Code And Other Confidential Business Information

121.   On Friday, August 28, 2015, Priority's system security protocols identified that Simone had attempted to grant file share access to four e-mail addresses associated with Luma Consultores.  At the time of that identification, Simone was working for Priority.  He also, unknown to Priority, was working for SignaPay in developing SAFYER.

122.   The shared file contained a link to a ZIP file labeled "TSYSExpress.zip" on Google Drive that contained a copy of a portion of VIMAS's Source Code, including the subcomponent that enables VIMAS to talk to TSYS via the TSYS Express framework.

123.   Priority's security protocols blocked the file share, but Priority discovered that Simone had also granted file share access to the same ZIP file to his personal Hotmail account.  Simone's attempted file share of the ZIP file to his personal Hotmail account outside of Priority's systems was a clear violation of Priority's Data Security Policy.

124.   Simone was aware of Priority's policies and procedures governing data security.  For example, in January 2015, as part of Priority's annual Web Application Security Risks training, he certified that he would comply with Priority's policies and procedures, and that a failure to do so might subject him to disciplinary actions or civil or criminal penalties.

125.   Following Priority's discovery of Simone's file share, Jason Horine, Priority's Vice President of Security and Compliance, and David Mathena, Priority's Vice President of Software Development and Simone's supervisor, immediately called Simone and advised him that he had violated company policy by sending the file share outside of Priority's systems domain.

126.   Simone denied sending the file share and claimed that his e-mail had been hacked.

127.   Horine and Mathena checked the IP address that had been used to send the file share of the ZIP file and determined that it was the same IP address

Simone had been using when previously working on Priority's network.  As a result, Priority concluded that Simone's account had not been hacked.

128.   Horine and Mathena then contacted Priority's Chief Technology Officer, Sean Kiewiet, to notify him of Simone's violation of the Data Security Policy.  Together, Kiewiet, Horine, and Mathena called Simone and asked to view his Hotmail account.  To accomplish this, Simone was asked to log on to Google Hangout so he could share his desktop via a web meeting.  Simone agreed to do so.

129.   Priority's computer systems are set up to allow employees to log on easily to Google Hangout, and it typically takes less than a minute to do so.  On this occasion, however, Simone took much longer than normal to log on to Google Hangout.  He claimed that he was having browser and computer trouble. Eventually, after a delay of approximately ten minutes, Simone logged on to Google Hangout, which allowed Kiewiet, Horine, and Mathena to review the contents of Simone's Hotmail account.

130.   While reviewing the e-mails, Kiewiet, Horine, and Mathena noticed that there were a number of e-mails between Simone and Ordoñez, Bohan, and Javier Uanini, each of whom is a former Priority employee who, within the past year, has become employed by SignaPay.

131.    Priority also noticed that there were a number of e-mails between Simone and employees of Luma Consultores.

132.    Simone was asked why he had been sending and receiving e-mails with SignaPay employees.  He replied that he had been working for SignaPay for "a couple of months."  In fact, Simone had been working on the development of SAFYER for SignaPay since at least the fall of 2014.

133.    Prior to August 28, 2015, Simone had failed to disclose to Priority his relationship with SignaPay.  Had Priority known of Simone's relationship with SignaPay, Priority would have terminated its relationship with Simone and Intrend because SignaPay is one of Priority's ISOs.

134.    Priority terminated the services of Simone and Intrend on August 28, 2015.

135.    In the days subsequent to Priority's August 28, 2015 discovery of Simone and Intrend's violation of the Data Security Policy, Priority conducted an internal investigation into the circumstances surrounding the incident.

### 5.  Priority's Notice To SignaPay Of The Misappropriation Of Its VIMAS Source Code And Other Confidential Business Information

136.    Priority notified SignaPay of the misappropriation of the VIMAS Source Code when Tom Priore, Priority's Chairman of the Board, reached out to

Martillo by telephone and by e-mail in September 2015.

137.   The telephone conference between Mr. Priore and Martillo was held on September 10, 2015.  In that call, Priority, via Mr. Priore, informed SignaPay, via Martillo, that Priority had discovered a breach of its data security and trade secrets and that Simone had attempted to, or did, misappropriate certain of Priority's trade secrets.

138.   On September 10, 2015, Priority's General Counsel sent an e-mail to Martillo.  In that e-mail, Priority notified SignaPay that it was in breach of the Agreement because "one of [Priority's] long time contractors (whom we recently learned also works for SignaPay) has obtained, without authorization, Priority/Cynergy's source code associated with our VIMAS system."  As a result, "based on evidence that we have received from the contractor, we have sufficient reason to believe that one, or more, SignaPay employees are in possession of our company's trade secret source code."

139.   In the e-mail notice, Priority advised SignaPay that the █████████████ █████████████████████████████████████████████████████████████████████████████ ██████████████████████.

140.   The September 10, 2015 e-mail notice also advised SignaPay that Priority, ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

141.    The e-mail notice also advised that because Priority had "a reasonable basis to suspect a material breach" of the Agreement, ████████████████████ ████████████████████████████████████████

142.    Subsequently, on September 13, 2015, Mr. Priore e-mailed Martillo in light of one of their telephone conversations in which Ordonez told Martillo that Simone "was lazy and tried to take a shortcut copying information."  In that same e-mail, Mr. Priore laid out five scenarios, in order of least to most disruptive, whereby the parties could conduct a forensic audit of SignaPay to determine whether, and to what extent, portions of the VIMAS Source Code were on SignaPay's systems.

143.    Martillo responded to the e-mail on September 14, 2015, and proposed a telephone call to discuss how best to proceed.

### 5.      Defendants' Delay And Obstruction Of A Forensic Audit

144.    Between early September 2015 and mid-November 2015, Priority engaged in extensive efforts to work with SignaPay to determine if SignaPay has, or had, a copy of the VIMAS Source Code.  These efforts included telephone phone calls and e-mails between the parties' senior management, including, among

others, Mr. Priore and Chris Prince (Priority's General Counsel) for Priority and Martillo and Ordoñez for SignaPay.

145.    The parties' initial discussions focused on agreeing on the identity of a neutral forensic auditor.   SignaPay proposed using a Texas-based forensic company, Eureka Software Solutions ("Eureka").   SignaPay advised Priority that it identified Eureka after an internet search.  Priority was unfamiliar with Eureka and it wanted to use a forensic auditor with a more well-known, national reputation as well as having an international presence, particularly in Argentina, where Simone resides and where Priority understands that other contractors working on SAFYER are based.

146.    Therefore, on October 1, 2015, Priority notified SignaPay that it proposed using Pricewaterhouse Coopers ("PwC"), which did not have a pre-existing relationship with either party, to conduct the forensic audit.

147.    The parties held a conference call on October 5, 2015, during which SignaPay agreed to use PwC to conduct a forensic audit.

148.    On October 5, 2015, SignaPay notified Priority by e-mail that it had engaged Eureka through its principal, Monty Myers, to monitor PwC during the forensic audit.

149.   On October 6, 2015, a conference call was held with SignaPay, Myers, Priority, and PwC to discuss the scope of the forensic audit—the first of many such calls on that subject.

150.   Between October 6, 2015 and October 21, 2015, the parties held several conference calls and exchanged e-mails regarding (1) the scope of the audit, (2) SignaPay's request for a confidentiality agreement, (3) a non-disclosure agreement, and (4) safeguards to ensure that Priority did not somehow obtain access to SignaPay's confidential business information during or following PwC's audit.

151.   On October 19, 2015, Martillo told Mr. Priore "[w]e don't even have a product ready for market, everything is still in development stage."   That statement by Martillo was false.

152.   On October 21, 2015, the parties reached an agreement on how far back the audit would go (to the date of Priority's merger with Cynergy in May 2014) and the general scope of the forensic audit (the SignaPay employees and consultants emails that would be searched would be identified as a result of PwC interviews of SignaPay employees).

153.   At all times during the more than two months that the parties discussed a forensic audit, Priority made it clear that the forensic audit would not

be restricted to SAFYER and would have to include a review of SignaPay's other computer and e-mail systems.

154.    In order to determine the appropriate scope of the audit, PwC interviewed several SignaPay employees at SignaPay's offices in early November 2015.

155.    Based on those interviews, PwC determined the scope of SignaPay's computer systems that would be forensically audited to determine whether SignaPay or its employees and contractors were in possession of the VIMAS Source Code.

156.    But after more than two months of negotiations, SignaPay refused to allow PwC to audit SignaPay's computer systems.

157.    It is now clear that once SignaPay was notified that Priority had discovered the scheme to misappropriate Priority's VIMAS Source Code and other confidential business information, SignaPay accelerated the development of SAFYER in an attempt to get the system operational as quickly as possible.

158.    Despite SignaPay's representations to Priority that SAFYER was not operational, in October 2015 SignaPay began using SAFYER to manage approximately 2,000 merchants – merchants that otherwise would have been boarded and managed on VIMAS.

159.    SignaPay purposefully dragged out negotiations over the forensic audit long enough to allow SAFYER to become operational.

160.    After SignaPay refused to allow Priority to conduct a forensic audit of SignaPay's computer systems, Priority was left with no choice but to file this lawsuit on November 11, 2015.

## III.    ORDOÑEZ'S BREACH OF HIS SEPARATION AGREEMENT

### A.    Ordoñez's Violation Of Priority's Security Policies In 2014

161.    After the May 2014 PPS-Cynergy merger, Priority retained Ordoñez as a senior manager.

162.    Just a few months later, on September 27, 2014, Ordoñez e-mailed Priority corporate data and file specifications to a personal Hotmail account.

163.    Priority's policies and procedures prohibit Priority employees or contractors from sending Priority information or data to personal e-mail addresses. Priority's Data Security Policy also requires that any design and specification documents that are transferred via e-mail must be encrypted.  The corporate data and file specifications that Ordoñez sent to his personal Hotmail account were not encrypted, thereby violating Priority's Data Security Policy.

164.    As a result of his violation of Priority's Data Security Policy, Ordoñez signed a Security Incident Report.  By signing the report, Ordoñez acknowledged

that he had violated Priority's policies and procedures by sending an unencrypted file to a personal Hotmail account.

165.    Ordoñez's September 27, 2014 e-mail was a test of Priority's security systems to see how best he could remove confidential business information from Priority's domain without being detected.

166.    Ordoñez was working for SignaPay to develop SAFYER while employed by Priority.  He never told Priority that he was working for one of Priority's competitors.  In fact, he took steps to hide his work for SignaPay from Priority.

**B.    Ordoñez's Separation Agreement With Plaintiffs**

167.    Ultimately, Plaintiffs and Ordoñez agreed that Ordoñez's employment with Priority would terminate as of December 31, 2014.

168.    In December 2014, Ordoñez executed a contract ("Separation Agreement") setting forth the terms and provisions governing Ordonez's departure from his employment with Priority.  Ordoñez signed the Separation Agreement on December 30, 2014.

169.    The Separation Agreement was executed ██████████████████

██████████████████████████████████████████

██████████████████████████

170. ██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████

171.   Additionally, in a provision entitled ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

172.   The Separation Agreement defined ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

173.   Ordoñez   also   agreed   that   ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████

174.   In a provision entitled   ████████████████████████

████████████████████████████



175.   The Separation Agreement is ███████████████████████

████████████████████████████████████████████████████████████

████████████████

### C.   Ordoñez's Breaches Of The Separation Agreement

176.   Unbeknownst to Priority, after Ordoñez left Priority in December 2014, he continued to work for SignaPay on developing SAFYER for NMSA.

177.   While acting as a NMSA consultant or while he otherwise was working for NMSA, Ordoñez repeatedly breached the Separation Agreement by disclosing Priority's proprietary VIMAS Source Code and other confidential business information to SignaPay in the development of SAFYER.

178.   In a press release dated April 20, 2015, SignaPay announced that Ordoñez had formally joined the company's executive leadership team as its chief technology officer.  The press release stated that "Ordoñez brings a wide array of skills to SignaPay specific to technology innovation, project management, software development, clearing and settlement platforms and leadership needed to meet the demands of consumer and partnership growth."

179.   The press release also stated that "Ordoñez was a pioneer in the payment industry creating VIMAS."

180.    Other former Cynergy employees have moved to SignaPay since the end of 2014, including Bohan.  In 2015, Bohan joined SignaPay as its Director of Software Development.

181.    Similarly, Javier Uanini was employed as a software developer for Cynergy and Priority until January 2015.  Uanini left Priority in January 2015 and has since joined SignaPay to work for PayHub, a company SignaPay acquired in late 2014.

182.    Ordoñez solicited Bohan and Uanini to leave their employment at Priority and join SignaPay.

183.    Ordoñez solicited Simone to work for SignaPay.

184.    Ordoñez developed the Cyris risk management system for Cynergy. In violation of the ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████.

## IV.    SIGNAPAY'S BREACHES OF THE AGREEMENT

185.    SignaPay breached its Agreement with Priority by creating a scheme to solicit and then hire Priority's employees to use Priority's proprietary VIMAS Source Code and other confidential business information to build SAFYER.

186.   Building a merchant application system is costly and can take years. SignaPay sought to jump start the development of its system by misappropriating Priority's programs and source code which allowed SignaPay to significantly shorten the time needed to develop the system and greatly reduce the development costs.  Had SignaPay not misappropriated the VIMAS Source Code, it would not have an operational merchant management system today.

187.   In furtherance of its scheme to build SAFYER, SignaPay and Martillo hired or otherwise contracted with Ordoñez, NMSA, Bohan, Intrend, and Simone, all of whom SignaPay knew were employed by or otherwise had a business relationship with Priority, ████████████████████████████████

████████████

188.   SignaPay's employees and consultants (Ordoñez, NMSA, Bohan, Intrend, and Simone) misappropriated Priority's proprietary VIMAS Source Code and other confidential business information in order to build SAFYER.  The theft of the Source Code and other confidential business information ██████████

████████████████████████████████████████████

189.   In addition to misappropriating the VIMAS Source Code, Ordoñez, NMSA, Bohan, Intrend, and Simone also reverse engineered the VIMAS Source

Code and functionality so that portions of SAFER use the exact same source code and/or logic as VIMAS.

190. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████.

191. When Priority discovered that Simone had misappropriated the VIMAS Source Code, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

192. It is now clear that SignaPay had no intention ██████████████████

████████████████████ the Agreement, and the two months of negotiations that SignaPay had with Priority was purely a delaying tactic to allow SignaPay to expedite the development of SAFYER so that it could become operational.

193. Upon information and belief, SignaPay's plan was that once SAFYER was operational and had the same functionality as VIMAS, including the risk management and residual management modules that SignaPay continued to

develop even after this lawsuit was filed, SignaPay's plan was, and remains, to move all of SignaPay's existing merchants that were using VIMAS to SAFYER.

## V.    THE IRREPARABLE HARM PRIORITY FACES

### A.    The Irreparable Harm To Priority

194.    SignaPay's access to and/or possession of the VIMAS Source Code and other Priority confidential business information has and will continue to allow SignaPay to accelerate the development of its SAFYER system or other merchant management system unless the existing injunction is made permanent.  SignaPay's ability to use SAFYER will cause irreparable harm to Priority because if not enjoined SignaPay will quickly be able to complete the development of SAFYER which will have the same functionality as VIMAS.

195.    If SignaPay were going to build a merchant application system that had functionality similar to VIMAS, this development process would take years and a substantial investment.  Defendants' misappropriation of the VIMAS Source Code and Priority's other confidential business information allowed them to significantly shortcut the time and investment that would be necessary to build a merchant application system.

196.    The seriousness of Priority's situation is heightened by the fact that Ordoñez was one of the chief architects of VIMAS, Bohan managed VIMAS for

several years while employed by Cynergy and then Priority, and Simone was one of the lead developers of VIMAS when he worked for Cynergy and Priority.  As such, SignaPay, Ordoñez, Bohan, and Simone have been able to use the VIMAS Source Code and Priority's other confidential business information, including but not limited to Cyris, to design and develop a competing merchant management system that contains VIMAS's proprietary features.

197.    Moreover, SignaPay's competing SAFYER system has been built to connect with TSYS – the same capabilities contained in in the TSYSExpress.zip file that Simone attempted to, or did, misappropriate from Priority.

198.    SignaPay contacted TSYS to begin the necessary steps to board and manage merchants using the SAFYER system.

199.    Once SAFYER became partially operational in October 2015, SignaPay began boarding and managing merchants on SAFYER instead of VIMAS.

200.    SignaPay plans on moving all of its merchants to SAFYER once SignaPay's contract with Priority expires in May 2016.

201.    Once SignaPay has finished SAFYER's development, it can immediately begin competing with Priority.

202.    If SignaPay begins competing directly with Priority, Priority will be irreparably harmed in multiple ways.

203.    First, Priority likely will lose all of the current SignaPay merchants that use Priority to connect to TSYS.

204.    Second, SignaPay will be able to market its merchant management system to other ISOs and merchants that use VIMAS.

205.    Third, SignaPay will be able to market its competing merchant management system to future ISOs, and merchants that otherwise might have chosen VIMAS because of its functionality.

206.    Because SignaPay's competing SAFYER system will have the same functionality as Priority's systems (i.e., expedited sign-up, risk management, and residual management), Priority expects that other ISOs and merchants will find SignaPay's merchant management system to be an alternative to Priority's systems.  Such a result would be devastating to Priority's ongoing business viability because, in Priority's experience, a customer that is lost is very hard to retrieve.

207.    Defendants' misappropriation and/or theft of Priority's VIMAS Source Code and other confidential business information has caused Priority to

suffer, and to continue to suffer, irreparable harm for which there is no adequate remedy at law.

208.    As a proximate result of Defendants' misappropriation and/or theft of Priority's VIMAS Source Code and other confidential business information, Priority has been damaged in an amount to be determined at trial.

## CAUSES OF ACTION

## COUNT I:  VIOLATION OF THE GEORGIA TRADE SECRETS ACT
### (O.C.G.A. §§ 10-1-760 *et seq.*)
### (Against All Defendants)

209.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 208 above.

210.    Priority's VIMAS Source Code derives, and has derived, both actual and potential economic value to Priority from not being generally known to, and not being readily ascertainable by proper means by, the public and other persons who can and could obtain economic value from its disclosure or use.

211.    The VIMAS Source Code is and was the subject of efforts that were reasonable under the circumstances to maintain its secrecy, including, without limitation, the use of confidentiality agreements, company policies and education, and mechanical, electronic, and systematic security methods.

212.    The VIMAS Source Code contains trade secrets within the meaning of O.C.G.A. §§ 10-1-760 *et seq.*

213.    Defendants used improper means to acquire Priority's trade secrets and then disclosed or used, or attempted to disclose or use, Priority's trade secrets without its consent to create, build, and develop SignaPay's competing merchant management system, SAFYER.

214.    Defendants disclosed or used Priority's trade secrets without consent and, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire said knowledge.

215.    Defendants disclosed or used Priority's trade secrets without consent and, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

216.    Defendants disclosed or used Priority's trade secrets without consent and, at the time of disclosure or use, knew or had reason to know that knowledge of the trade secrets was derived from or through a person who owed a duty to Priority to maintain its secrecy or limit its use.

217. The actions of Defendants constitute misappropriation of trade secrets in violation of the Georgia Trade Secrets Act, O.C.G.A., §§ 10-1-760 *et seq*.

218. Because Defendants' willful, wanton, and malicious misappropriation of Priority's trade secrets proximately caused and continues to cause Priority immediate and irreparable harm for which there is no adequate remedy at law, Priority is entitled to (1) preliminary and permanent injunctive relief against Defendants to recover the misappropriated trade secrets and to prevent further disclosure and harm, including, without limitation, a temporary restraining order and an interlocutory and permanent injunction; and (2) all damages incurred by Priority, as determined by the finder of fact, plus exemplary damages pursuant to O.C.G.A. § 10-1-763, court costs, and attorneys' fees.

## COUNT II: COPYRIGHT INFRINGEMENT (17 U.S.C. § 101 *et seq*.)
### (Against All Defendants)

219. Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 218 above.

220. The VIMAS merchant application system is subject to a valid copyright.

221. Priority is the lawful owner of VIMAS.

222. Defendants willfully and repeatedly copied the VIMAS Source Code in order to build SignaPay's competing merchant application system, SAFYER.

223.    Defendants' conduct has proximately caused and is causing injury to Priority and its property.

224.    Priority has been damaged by Defendants' violations of 17 U.S.C. § 101 *et seq.* in an amount to be determined at trial, and also is entitled to injunctive relief and to recover its attorneys' fees and costs of suit.

## COUNT III:  VIOLATIONS OF THE CFAA (18 U.S.C. § 1030 *et seq.*)
### (Against All Defendants)

225.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 224 above.

226.    Defendants knowingly, and with intent to defraud, accessed Priority's protected computer systems and domain without authorization, or alternatively, in excess of their authorization.

227.    Defendants' improper access to Priority's computer systems and domain furthered the intended misappropriation of the VIMAS Source Code and other confidential business information and obtained value of more than $5,000 in damages in a one year period.

228.    Priority has been damaged by Defendants' violations of 18 U.S.C. § 1030 *et seq.* in an amount to be determined at trial, and also is entitled to injunctive relief and to recover its costs of suit.

## COUNT IV:  VIOLATIONS OF THE SCA (18 U.S.C. § 2701 *et seq.*)
## (Against All Defendants)

229.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 228 above.

230.   Defendants   knowingly   and   intentionally   accessed,   without authorization, Priority's computer systems and domain through an e-mail or other electronic communication service.

231.    Defendants knowingly and intentionally exceeded any authorization to access to Priority's computer systems or domain in order to develop SAFYER, which will result in harm to Priority because SAFYER will compete with VIMAS.

232.    Defendants  obtained  access  to  a  wire  or  electronic  communication while it was in electronic storage as defined in 18 U.S.C. § 2701, *et seq*.

233.    Priority  has  been  damaged  by  Defendants'  violations  of  18  U.S.C. § 2701 *et seq.* in an amount to be determined at trial, and also is entitled to recover its costs of suit.

## COUNT V:  RICO (18 U.S.C. § 1961 *et seq.*)
## (Against All Defendants)

234.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 233 above.

235.   Defendants conspired to misappropriate or steal the VIMAS Source Code and Priority's other confidential business information in order to build SAFYER so that SignaPay could compete directly with Priority.

236.   Defendants entered into an enterprise that lasted from at least October 2014 to January 2016 to misappropriate Priority's VIMAS Source Code and other confidential business information to develop SAFYER.

237.   Defendants e-mailed and called each other regularly while misappropriating Priority's VIMAS Source Code and other confidential business information to develop SAFYER.

238.   Defendants Ordoñez, Bohan, and Simone went to great lengths to hide the fact that they were working for SignaPay to develop SAFYER.

239.   Defendants committed multiple predicate acts, *i.e.,* crimes, listed in 18 U.S.C. § 1961(1), including but not limited to multiple counts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 in furtherance of their scheme to misappropriate or steal Priority's VIMAS Source Code to build SAFYER and compete directly with Priority.

240.   Defendants have gone to great lengths to obtain the VIMAS Source Code and Priority's other confidential business information.   In doing so, Defendants have made multiple misrepresentations and hid their identity so that

Priority would not realize that SignaPay was developing SAFYER and using the VIMAS Source Code to do so.

241.   Because of the steps that Defendants took to hide the development of SAFYER, Priority had no reason to believe that SignaPay was planning on competing with Priority by offering a product that was comparable to VIMAS.

242.   Priority has suffered injury by reason of the Defendants' repeated and systemic misrepresentations, including multiple instances of mail fraud and wire fraud.

243.   Priority has provided information to SignaPay in response to requests for "bugs" wholly unaware that SignaPay's requests were fraudulent and intended to obtain information about VIMAS or Priority's merchants so that SignaPay could further develop SAFYER.

244.   Simone used e-mail to send a link of the VIMAS Source Code to his personal Hotmail account and the e-mail addresses of Luma Consultores developers who were (and are) working on SAFYER.

245.   SignaPay and its employees and consultants used aliases and pseudonyms in e-mails with Priority to hide the fact that it was Ordoñez and Bohan who were accessing VIMAS.

246.    SignaPay has begun boarding and managing merchants using SAFYER that otherwise would have been boarded and managed by VIMAS thereby depriving Priority of revenue.

247.    Priority has been damaged by Defendants' violations of 18 U.S.C. § 1962(b)-(d) in an amount to be determined at trial, including treble damages, and also is entitled to recover its costs of suit.

### COUNT VI:  BREACH OF FIDUCIARY RELATIONSHIP AND DUTY OF LOYALTY (Against Defendants Ordonez And Bohan)

248.    Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 247 above.

249.    In the fall of 2014, Ordoñez and Bohan were trusted employees that worked for Priority.  Both employees were involved in the development and operation of VIMAS while employed by Priority.

250.    Priority entrusted Ordoñez and Bohan with access to Priority's highly confidential information, including its VIMAS system and, specifically, the VIMAS Source Code.

251.    As a result, the relationship with Priority, on the one hand, and Bohan and Ordoñez on the other hand, was one of mutual confidence.

252.   As a result of the confidential relationship between Priority and Bohan, Bohan owed fiduciary duty and a duty of loyalty.

253.   As a result of the confidential relationship between Priority and Ordoñez, Ordoñez owed fiduciary duty and a duty of loyalty.

254.   Beginning no later than September 27, 2014, Ordoñez began working for SignaPay to build SAFYER that would directly compete with VIMAS.

255.   Ordoñez formed NMSA to conduct the development of SAFYER.

256.   NMSA hired Bohan to assist with development of SAFYER.

257.   Between September 2014 and December 2014, when Ordoñez left Priority, he was engaged in development activities for SignaPay that directly competed with Priority, thereby breaching his fiduciary duty and duty of loyalty owed to Priority.

258.   Between October 2014 and January 2015, when Bohan left Priority, he was engaged in development activities for SignaPay that directly competed with Priority, thereby breaching his fiduciary relationship and duty of loyalty owed to Priority.

259.   As a direct and proximate cause of Ordoñez's and Bohan's breaches of their fiduciary duties and duties of loyalty owed to Priority, Priority has been injured.

260.   Priority has been damaged by Ordoñez and Bohan as a result of their breach of fiduciary duty and duty of loyalty owed to Priority in amount to be determined at trial.

## COUNT VII:  BREACH OF CONTRACT
## (Against Defendants Intrend And Simone)

261.   Plaintiffs reallege and incorporate by reference, as if fully set forth herein, the allegations of paragraphs 1 through 260 above.

262.   Intrend, through its principal Simone, entered into a valid and enforceable contract with Cynergy in 2009 to perform software developer services for Cynergy.

263.   Intrend and Simone were paid by Cynergy for the software developer services.

264.   Intrend and Simone continued to provide such services to Priority under the contract following the 2014 merger of Priority and Cynergy.

265.   Through the acts described above, Intrend and Simone have misappropriated, or attempted to misappropriate, Priority's trade secrets.

266.   The acts described above constitute a breach of contract by Intrend and Simone.

267.   As a direct and proximate cause of Intrend's and Simone's breaches of contract, Priority has been damaged in an amount to be determined at trial.

## COUNT VIII:  BREACH OF CONTRACT
### (Against Defendant Ordoñez)

268.    Plaintiffs reallege and incorporate by reference, as fully set forth herein, the allegations of paragraphs 1 through 267 above.

269.    The Separation Agreement is a valid and enforceable contract.

270.    As set forth above, Ordoñez has breached his obligations under the Separation Agreement by, among other acts, ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

271.    Ordoñez's breaches of the Separation Agreement have directly and proximately caused Priority to incur damages.

272.    Priority is entitled to recover damages resulting from Ordoñez's breach of the Separation Agreement in an amount to be determined at trial.

273.    Furthermore, Priority is entitled to injunctive relief against Ordoñez

pursuant to the Separation Agreement.

## COUNT IX: BREACH OF CONTRACT
### (Against Defendant SignaPay)

274.    Plaintiffs reallege and incorporate by reference, as fully set forth

herein, the allegations of paragraphs 1 through 273 above.

275.    The Agreement between SignaPay and Priority is a valid and

enforceable contract.

276.    As set forth above, SignaPay has breached its obligations under the

Agreement by, among other acts, ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

277.    As a direct and proximate result of SignaPay's breaches of the Agreement, Priority has incurred and continues to incur damages.

278.    Priority is entitled to recover damages resulting from SignaPay's breach in an amount to be determined at trial.

279.    Furthermore, Priority is entitled to injunctive relief against SignaPay pursuant to Section 4.2 of the Agreement.

## COUNT IX:  TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP AND/OR CONTRACT
### (Against Defendants SignaPay, Ordoñez, Simone, Martillo, And NMSA)

280.    Plaintiffs reallege and incorporate by reference, as fully set forth herein, the allegations of paragraphs 1 through 279 above.

281.    Defendant Simone had a business relationship with Cynergy and Priority and had performed software programming services pursuant to a valid and enforceable contract with Cynergy since 2009.

282.    As of January 2015 forward, Defendants SignaPay, Ordoñez, Martillo, and NMSA were strangers to Simone's employment relationship with Priority and did not stand to benefit from Simone's employment relationship with Priority.

283.    Ordoñez, working on behalf of SignaPay, Martillo, and NMSA, and with knowledge of Simone's business relationship and contract with Cynergy, induced Simone to breach his contract with Cynergy and to begin working for

SignaPay.  Ordoñez, SignaPay, Martillo, and NMSA acted purposefully and with malice to injure Priority in interfering with Simone's business and contractual relationship with Priority.

284.   As a proximate result of Ordoñez's interference, Priority has suffered damages in an amount to be proven at trial.

285.   Defendant Ordoñez executed a valid and enforceable Separation Agreement with Cynergy and its affiliates in December 2014.

286.   Defendant Simone was a stranger to the Separation Agreement and had no economic interest in the Separation Agreement.

287.   Upon information and belief, Simone induced Ordoñez to breach his Separation Agreement with Cynergy ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████.

288.   As a proximate result of Simone's interference, Priority has suffered damages in an amount to be proven at trial.

289.   As a proximate result of SignaPay's, Ordoñez's, Simone's, Martillo's, and NMSA's intentional and malicious interference with a business relationship and/or contract, Priority is entitled to punitive damages in an amount to be proven at trial.

## COUNT X:  FRAUD
### (Against Defendants SignaPay, Martillo, Ordoñez, And Simone)

290.    Plaintiffs reallege and incorporate by reference, as fully set forth herein, the allegations of paragraphs 1 through 289 above.

291.    Simone placed a ZIP file that contained a portion of the VIMAS Source Code on Priority's Google Drive in November 2014, marked the file as private so it was encrypted, and granted access only to himself and the Luma Consultores programmers that were working on SAFYER's development.

292.    Simone and the Luma Consultores programmers used the VIMAS Source Code to develop SAFYER.

293.    When Priority discovered that Simone had misappropriated the VIMAS Source Code and contacted Simone, he denied having done so and alleged he had been hacked, which was a misrepresentation.

294.    When Priority notified SignaPay, Martillo, and Ordoñez that Simone had misappropriated the VIMAS Source Code SignaPay, Martillo, and Ordoñez denied that they were aware of the misappropriation of the VIMAS Source Code. That statement was a misrepresentation because SignaPay, Martillo, and Ordoñez were aware from at least October 2014 that Ordoñez, Bohan, and Simone had misappropriated the VIMAS Source Code in order to develop SAFYER.

295.    SignaPay, Martillo, and Ordoñez told Priority that the VIMAS Source Code was not used in SAFYER.  They knew such statement to be false because they had been involved in a scheme since October 2014 to misappropriate the VIMAS Source Code to develop SAFYER.

296.    SignaPay, Martillo, Ordoñez, and Simone took steps to hide the development of SAFYER including setting up a separate consulting group NMSA to do the development of SAFYER, having Ordoñez and Bohan use aliases and pseudonyms to hide the fact that SignaPay's employees were accessing VIMAS so they could develop SAFYER, lying when Bohan accidently sent Simone an e-mail to his Priority e-mail address by claiming that the e-mail was intended for a different Simone, and claiming that Simone had been hacked when the conspiracy was discovered when this statement was clearly false.

297.    SignaPay, Ordoñez and Bohan submitted false tickets to Priority claiming there were bugs with VIMAS so that Simone would have the ability to access VIMAS Source Code and so SignaPay could get the additional information about certain VIMAS modules and other confidential business information including Priority's merchants.  The submission of false tickets allowed SignaPay to further develop SAFYER.

298.   SignaPay, Martillo, Ordoñez, and Simone made these false misrepresentations described above to Priority knowing they were false.

299.   Priority reasonably and justifiably relied on these false representations.

300.   SignaPay, Martillo, Ordoñez, and Simone made the false representations to Priority so that Priority would not become aware that SignaPay was building a competing merchant application system using Priority's VIMAS Source Code and other confidential business information.

301.   Priority had security measures in place to protect its proprietary VIMAS Source Code and other confidential business information and it had no reason prior to August 28, 2015 to suspect that SignaPay, Martillo, Ordoñez, and Simone had misappropriated its VIMAS Source Code and other confidential business information.

302.   Priority took reasonable steps to protect its proprietary VIMAS Source Code and other confidential business information, including but not limited to putting provisions in the Agreement with SignaPay ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████.

303.    Priority took reasonable steps to protect its proprietary VIMAS

Source Code by entering into a Settlement Agreement with Ordoñez that

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████.

304.    As a direct and proximate result of SignaPay's, Martillo's, Ordoñez's

and Simone's intentional misrepresentations, Priority has suffered damages in an

amount to be proven at trial, including punitive damages, in an amount to be

proven at trial.

## COUNT XI:  ATTORNEYS' FEES AND COSTS PURSUANT
## TO O.C.G.A. § 13-6-11
## (Against All Defendants)

305.    Plaintiffs reallege and incorporate by reference, as if fully set forth

herein, the allegations of paragraphs 1 through 304 above.

306.    Defendants have continually denied liability and failed and/or refused

to take appropriate actions to remedy the damage caused by their actions.

307.    Defendants have acted in bad faith, have been stubbornly litigious,

and have caused Priority unnecessary trouble and expense.

308.    Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover from Defendants all of the costs and attorneys' fees that Plaintiffs have incurred and continue to incur as a result of Defendants' actions, and the failure and refusal of Defendants to acknowledge wrongdoing and/or remedy the damage caused by their actions.

## JURY DEMAND

309.    Plaintiffs respectfully demand a trial by jury on all issues triable to a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.    Enjoin Defendants and persons in active concert or participation with them from:

   (a)    using, disclosing, disseminating, or publishing to third persons, directly or indirectly through others, trade secret information, including but not limited to Priority's VIMAS Source Code, or other property taken from or belonging to Priority;

   (b)    submitting to a forensic audit of their computer systems used by SignaPay's employees or contractors involved in developing SignaPay's merchant management or other systems to be

performed by a neutral third party to ensure that no trade secrets or electronic copies of documents belonging to Priority remain on any such computer systems;

(c)    continuing to develop SignaPay's competing SAFYER merchant management system until a full forensic audit can be performed that will determine whether, and to what extent, Defendants are using the VIMAS Source Code or other trade secrets belonging to Plaintiffs in developing SAFYER;

(d)    accessing or attempting to access Priority's Merchant Management Systems;

(e)    destroying, discarding or concealing any documents, property, client information, trade secret information, or VIMAS Source Code belonging to Priority during the course of this litigation; and

(f)    committing further violations of the Separation Agreement (as to Defendant Ordoñez).

2.    Enjoin Defendants to return and turn over to Priority all originals and copies of any trade secret information, including but not limited to Priority's VIMAS Source Code, and any other corporate documents,

property, assets, or things of any nature taken from or belonging to Priority or obtained by any or all of the Defendants.

3.    Order that the Ordoñez, Intrend, and Simone not solicit business on behalf of SignaPay with any client which they had contacted or about which they obtained information while employed by Priority;

4.    Order that SAFYER, or any derivative of SAFYER, cannot be used to board and manage merchants.

5.    Award Plaintiffs monetary damages against Defendants for violations of the Georgia Trade Secrets Act in an amount to be proven at trial;

6.    Award Plaintiffs monetary damages against Defendants for violations of Computer Fraud and Abuse Act in an amount to be proven at trial;

7.    Award Plaintiffs monetary damages against Defendants for violations of Stored Communications Act in an amount to be proven at trial;

8.    Award Plaintiffs monetary damages, including the award of treble damages, against Defendants for violations of the RICO statute in an amount to be proven at trial;

10.   Award Plaintiffs monetary damages against Defendants Intrend and Simone, jointly and severally, for breach of contract in an amount to be proven at trial;

11.    Award Plaintiffs monetary damages against Defendant Ordoñez for breach of contract in an amount to be proven at trial;

12.    Award Plaintiffs monetary damages against Defendant SignaPay for breach of contract in an amount to be proven at trial;

13.    Award Plaintiffs monetary damages against Defendants SignaPay, Ordoñez, and Simone for tortious interference with business relationship and/or contract in an amount to be proven at trial;

14.    Award Plaintiffs monetary damages against Defendants Ordoñez and Bohan for breaches of fiduciary duty and breaches of the duty of loyalty in an amount to be proven at trial.

15.    Award Plaintiffs for monetary damages against Defendants SignaPay, Martillo, Ordoñez, and Simone for fraud in an amount to be proven at trial.

16.    Award Plaintiffs their attorney's fees, costs, and expenses pursuant to O.C.G.A. § 13-6-11;

17.    Award Plaintiffs punitive damages in an amount to be proven at trial; and

18.    Grant Plaintiffs such other relief as the Court deems necessary and appropriate.

This 24th day of February, 2016.

Respectfully submitted,

s/Barry Goheen
KING & SPALDING LLP

Barry Goheen
Georgia Bar No. 299203
Stephen P. Cummings
Georgia Bar No. 186015
Nicholas G. Hill
Georgia Bar No. 744482

1180 Peachtree Street NE
Atlanta, Georgia  30309
(404) 572-4600
(404) 572-5139 (facsimile)

Attorneys for Plaintiffs
*Priority Payment Systems,*
*Cynergy Data, LLC, and*
*Priority Holdings, LLC*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that 14 point New Times Roman was used for this

**FIRST AMENDED COMPLAINT** and that it has been formatted in compliance

with Local Rule 5.1.

DATED:  February 24, 2016.

/s/ *Barry Goheen*
Barry Goheen

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the

foregoing with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to the following counsel of record:

Joseph C. Peake, III
Stout Kaiser Matteson Peake & Hendrick, LLC
1117 Perimeter Center West
Suite W400
Atlanta, GA  30338

Joel Reese
Reese Gordon Marketos LLP
750 N. Saint Paul St., Suite 610
Dallas, Texas 75201

DATED:  February 24, 2016.

/s/ *Barry Goheen*
Barry Goheen